JUDGE BERMAN

Gregory A. Kasper
kasperg@sec.gov
Terry R. Miller
millerte@sec.gov
James A. Scoggins, II
ScogginsJ@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000



17 CV 2088

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 17 Civ.    (   ) |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| - against - | |
| ARIEL DARVASI and AMIR WALDMAN, | **ECF CASE** |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Ariel Darvasi and Amir Waldman (collectively, "Defendants"), alleges as

follows:

### SUMMARY

1.        This is an insider trading case based on highly suspicious and profitable trading by

Defendants in the securities of Mobileye, N.V. ("Mobileye"), a Netherlands company based in

Israel and traded on the New York Stock Exchange.  Defendants took large positions in Mobileye

securities shortly before Intel Corporation ("Intel") announced its agreement to acquire Mobileye

by tender offer.  The deal was announced before trading opened on March 13, 2017

("Announcement").  Following the Announcement, Mobileye's share price increased 28 percent

to $60.62 by the close of trading that day.  Defendants' remarkably timed purchase of equities

and speculative, out-of-the-money call options in Mobileye resulted in combined realized and unrealized profits of over $4.9 million.  Defendants are connected to Mobileye insiders through the scientific academic community at the Hebrew University of Jerusalem ("HUJI"), which developed Mobileye technology and produced numerous current directors and officers at Mobileye.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

2.     The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l].  The Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

4.     Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the

facilities of a national securities exchange.  Mobileye stock is traded on the New York Stock Exchange and the securities that Defendants purchased were traded on a number of different exchanges, including AMEX, NASDAQOM, MIAX, PHX, BOX, CBOE, NYSE, NYSE ARCAand GEMINI.  At least four of those exchanges—AMEX, NYSE, NYSE ARCA, and ISE Gemini—are located in Manhattan.

## DEFENDANTS

5.    **Ariel Darvasi**:  Dr. Ariel Darvasi resides in Mevasseret Zion, Israel.  He is a Professor of Genetics in the Center for Research on Pain at HUJI.  As described more fully below, Darvasi made suspicious Mobileye equity trades with a potential profit of approximately $427,000.

6.    **Amir Waldman**:  Dr. Amir Waldman is a resident of Yarqona, Israel.  He earned his Ph.D. from HUJI and, according to his own statements, he is a self-employed engineer.  As described more fully below, Waldman made suspicious Mobileye option trades with a potential profit of approximately $4.5 million.

## FACTS

### Intel's Announced Acquisition of Mobileye

7.    Mobileye is a Netherlands entity with its principal offices in Jerusalem, Israel. Mobileye is a software and technology developer for Advanced Driver Assistance Systems used for autonomous driving.  Members of the HUJI science community developed and commercialized Mobileye's technology at the time Waldman earned his Ph.D from HUJI. Numerous current Mobileye directors and officers are members of the HUJI science community. Mobileye's securities are registered under Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the ticker symbol MBLY.

8.      Intel is a Santa Clara, California based technology company.

9.      Intel began formal discussions with Mobileye in late January 2017.  Principals of the two companies met in New York on or about January 27, 2017, to discuss the transaction price.  On or about January 30, 2017, certain members of Mobileye's board discussed a potential transaction price, and by the following day, all members of Mobileye's board learned of the potential transaction.  The two companies executed a non-disclosure agreement on or about February 1, 2017, and held the first meetings that included legal and financial advisers on or about February 9, 2017.

10.     Intel executed a definitive agreement with Mobileye on Sunday, March 12, 2017 ("Definitive Agreement"), under which Intel would buy Mobileye for approximately $15.3 billion, or $63.54 per share, through a tender offer.  The deal was publically announced shortly before the market opened for trading on Monday, March 13, 2017.  The announced purchase price was a 34.4% premium over Mobileye's Friday, March 10, 2017, closing price of $47.27 per share.  After the Announcement, Mobileye opened on Monday, March 13, 2017, at its high for the day, $61.51, and closed at $60.62 per share, a 28 percent increase over its March 10 closing price.

### Darvarsi's Trading in Mobileye Securities

11.     Darvasi maintained a trading account at Interactive Brokers LLC ("Interactive Brokers").

12.     On the morning of March 2, 2017, ten days prior to the execution of the Definitive Agreement, Darvasi liquidated the only securities in his account —40,000 shares of Teva Pharmaceutical Industries LTD for a realized loss of $661,545.73.  In the afternoon of March 2, 2017, Darvasi used the proceeds from the liquidated shares, all available cash, and

approximately $756,000 of margin debt provided by Interactive Brokers to purchase 30,000 Mobileye shares at prices ranging from $46.3550 to $46.39943.

13.     Darvasi's position in Mobileye stock on March 2, worth nearly $1.4 million, represented 100 percent of the value in his Interactive Brokers account on that date.

14.     On March 13, 2017, Darvasi sold 100 Mobileye shares for a realized gain of $1,473.45.  The unrealized gain on his remaining 29,900 shares is approximately $427,000.

15.     Darvasi's Interactive Brokers statements show he has traded Mobileye securities on only one other occasion.  Darvasi purchased shares of Mobileye on January 5, 2016.  That same day, after market close, Mobileye publicly announced that it was deploying a mapping technology and new strategic partnership with Volkswagen.  He sold the shares the next day and sustained a loss of $4,820 on that trade.

16.     In summary, the trading in Darvasi's account includes the following indicators of unusual or suspicious trading:

　　　　a.  Darvasi purchased 30,000 Mobileye shares on March 2, 2017, after Mobileye and Intel had begun negotiations and just ten days before execution of the Definitive Agreement;

　　　　b.  Darvasi acted with urgency; his purchase was so large for Darvasi that he needed to liquidate all of the securities in his account to free up money to make the purchase on March 2;

　　　　c.  Davarsi also used all available cash and $756,000 of margin debt provided by Interactive Brokers to make the purchase;

      d.   Darvasi's position in Mobileye stock on March 2, worth nearly $1.4 million, represented 100 percent of the value in his Interactive Brokers account on that date; and

      e.   Darvarsi's trading resulted in unrealized profits of at least $427,000.

### Waldman's Trading in Mobileye Securities

17.     Waldman opened his Interactive Brokers account on October 5, 2016 with $50,000.  His statements show that this account has traded in only two securities other than Mobileye.

18.     Waldman engaged in a pattern of trading Mobileye options between November 2016 and February 2017.  Under this practice Waldman purchased Mobileye options expiring in December 2016, January 2017, and February 2017, and generally sold them prior to expiration, usually holding the contracts for two weeks or less.

19.     For example, on November 16, 2016, Waldman purchased 1,200 Mobileye call options expiring on December 2 with strike prices between $39.00 and $42.00, representing options that were 4 to 11 percent out of the money compared to Mobileye's $37.57 November 16 closing price.  Between November 18 and November 21, Waldman sold all of the call options for a cumulative profit of approximately $36,000.

20.     Waldman generally took bullish Mobileye positions.  His options trading yielded realized gains of approximately $27,000 in December 2016 and approximately $92,000 in February 2017.  Waldman realized a loss of approximately $12,000 in January 2017 trading a mix of put and call options.

21.     Waldman deposited additional funds of $50,000 in November 2016 and $70,000 in January 2017.

22.     Starting on February 1, 2017, the same day that Intel and Mobileye executed a non-disclosure agreement, Waldman began accumulating Mobileye call option contracts expiring between March 3, 2017, and September 15, 2017, at strike prices above Mobileye's then current performance.

23.     For example, between February 1 and February 10, Mobileye's closing price ranged between a low of $42.42 and a high of $43.32. During the same period, Waldman bought 873 call option contracts expiring between March 3, 2017, and September 15, 2017, with strike prices ranging from $49.00 to $51.00, some of which were more than 20 percent out of the money at the time Waldman purchased them.

24.     By February 28, 2017, Waldman had accumulated 7,012 call options contracts expiring between March 3 and September 15 with strike prices ranging from $49.00 to $55.00. Mobileye last closed at or above $49.00 per share on August 23, 2016 and had not closed above $50.00 in the prior 17 months.

25.     Between March 1 and March 10, 2017, Waldman accumulated an additional 1,605 call options contracts, expiring between March 17 and June 16 with strike prices ranging from $49.00 to $55.00. As of March 10, 2017, Waldman held 5,339 Mobileye call options that he spent $237,581 to acquire.

26.     After the Announcement on Monday March 13, 2017, Waldman sold 1,697 of his options contracts for a realized gain of approximately $1,539,813. Waldman's currently held options represent an unrealized gain of approximately $2.96 million based on Mobileye's closing price on March 13.

27.     Waldman also withdrew $200,000 from his account on March 13, which is the maximum daily withdrawal allowed under the terms of his account.

28.     In summary, the trading in Waldman's account includes the following indicators of unusual or suspicious trading:

    a.  Waldman began accumulating call options in Mobileye one day after Mobileye directors learned of Mobileye's discussions with Intel on January 31, 2017;

    b.  The accumulated call options expired as early as March 3, 2017, at strike prices at or above Mobileye's 52-week high;

    c.  Waldman's accumulation of Mobileye options after Mobileye directors learned of discussions with Intel departed from his prior trading practices in at least three material respects:  (1) before he routinely sold his options prior to expiration, but he began holding them after February 1; (2) after February 1 he purchased call options with strike prices much farther out of the money than those purchased before Mobileye directors learned of a potential acquisition; (3) on these riskier options Waldman risked over six times the amount of cash on options purchased after the Announcement than he did during a longer period of time prior to the Announcement;

    d.  After the Announcement, Waldman sold 1,697 of his options contracts for a realized gain of over $1.5 million and withdrew the daily maximum from his account;

    e.  Waldman's trading resulted in realized and unrealized profits of at least $4.5 million—a return of 1883% percent in just six weeks.

**Defendants' Possession of, and Trading on, Material Nonpublic Information**

29.     Defendants and Mobileye have extensive connections through the science-based academic community at HUJI.

30.    HUJI is a nonprofit research university located in Jerusalem, Israel.  HUJI's science programs, including computer science, chemistry, physics, and life sciences, are located on the Edmond J. Safra Campus in Jerusalem's Givat Ram neighborhood.  Buildings housing those departments are clustered within approximately 500 meters of one another.

31.    In 1964, HUJI established the technology transfer company Yissum Research Development Company ("Yissum") to protect and commercialize intellectual property developed in HUJI's research facilities.  Yissum is a for-profit entity wholly owned by HUJI.

32.    Mobileye's technology emerged from the Mobileye Chairman's academic research at HUJI.  Yissum commercialized the HUJI-developed technology and licensed it to Mobileye in 1999.  Yissum's website still lists Mobileye as a subsidiary.  According to a July 14, 2014, Form F-1/A Mobileye filed with the Commission in connection with its initial public offering, Yissum owned 0.5 percent of Mobileye at the time of the offering.

33.    Many Mobileye directors and officers are professors, alumni, or otherwise connected to HUJI, including:

   a.    Director A earned her M.A. in Psychology from HUJI and has been a member of HUJI's Executive Committee of the Board of Governors since 2006;

   b.    Director B earned his B.A. in Economics and M.B.A. in Finance from HUJI;

   c.    Director C earned his B.Sc. in Computer Science from HUJI;

   d.    Director D has been a Professor of Computer Science at HUJI since 1996;

   e.    A Senior Vice President earned his Ph.D. from HUJI's Center of Neural Computation;

   f.    A Senior Vice President earned his Ph.D. from HUJI's Institute of Computer Science;

   g.    A Senior Vice President joined Mobileye while he was a student at HUJI's "Engineering, Intelligent Systems" program;

     h.   A Vice President is an Associate Professor at HUJI's Rachel and Selim Benin School of Computer Science and Engineering;

     i.   A Vice President earned his M.B.A. from HUJI;

     j.   A Vice President earned his Ph.D. from HUJI's Center of Neural Computation; and

     k.   A Vice President earned his B.Sc. in Computer Science from HUJI.

34.     Defendants belong to the same HUJI community as the Mobileye insiders who learned of the potential acquisition as early as February 1, 2017. Darvasi is currently a Genetics professor in the Life Sciences Department of HUJI. He earned his Ph.D. in Genetics from HUJI in 1994 and joined the faculty in 1999.

35.     Darvasi's graduate work, teaching, and ongoing research all takes place on HUJI's Givat Ram campus, where all of HUJI's science facilities are located.

36.     Waldman earned his Ph.D. from HUJI in the mid-1990s, with a research focus in Femtochemistry, a field that uses lasers to assist with chemical experiments. He earned this degree at HUJI at the same time that many of the current Mobileye directors and insiders studied, taught, or worked at HUJI.

37.     Waldman's graduate work at HUJI occurred in buildings located on HUJI's Givat Ram campus, where all of HUJI's science facilities are located.

38.     Upon information and belief, at the time Defendants purchased stock and options in Mobileye, as alleged above, they were in possession of material, nonpublic information about the Announcement. Defendants: (a) knew, recklessly disregarded, should have known, and/or had reason to know that their trading was in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, owed to the shareholders of Mobileye, or to the source from whom they received or obtained the material, nonpublic information; and/or (b) knew, recklessly disregarded, should have known, and/or had reason to know, that the material,

nonpublic information about the Announcement that had been obtained by them or conveyed to them was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

39.     Upon information and belief, any and all material, nonpublic information that Defendants received concerning the Announcement that was disclosed to them by any person was tipped by such person with the expectation of receiving a personal benefit, such person did in fact receive a benefit, and Defendants knew of such benefit.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

40.     The Commission realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

41.     By virtue of the foregoing, Defendants, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

42.     By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder
### (Against All Defendants)

43.     The Commission realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

44.     By virtue of the foregoing, Defendants, singly or in concert with others, in connection with a tender offer, directly or indirectly: (a) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) purchased or caused to be purchased securities or options to obtain securities while in possession of material information related to a tender offer which information Defendants knew or had reason to know was nonpublic and which Defendants knew or had reason to know had been acquired directly or indirectly from Intel or Mobileye or any officer director, partner, employee or any other person acting on behalf of Intel or Mobileye before such information and its source were publicly disclosed.

45.     By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3(a) thereunder [17 CFR § 240.14e–3(a)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a show cause order and an order temporarily and preliminary freezing Defendants' assets in the accounts in which the trading described in this Complaint occurred, and enter a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint;

## III.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1];

## IV.

Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.

Dated: March 23, 2017

_____
Gregory A. Kasper (NY 2735405; SDNY GK6596)
James A. Scoggins, II (*pro hac* admission pending)
Terry R. Miller (*pro hac* admission pending)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
kasperg@sec.gov
scogginsj@sec.gov
millerte@sec.gov