Gregory A. Kasper
kasperg@sec.gov
Terry R. Miller
millerte@sec.gov
Stephen C. McKenna
mckennas@sec.gov
James A. Scoggins, II
ScogginsJ@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>AMIR WALDMAN,<br><br>Defendant. | 17-cv-02088-RMB<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>**ECF CASE** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its First Amended Complaint against defendant Amir Waldman ("Defendant"), alleges as follows:

## SUMMARY

1. This is an insider trading case based on highly suspicious and profitable trading by Defendant in the securities of Mobileye, N.V. ("Mobileye"), a Netherlands company based in Israel and traded on the New York Stock Exchange. Defendant took large positions in Mobileye securities shortly before Intel Corporation ("Intel") announced its agreement to acquire Mobileye by tender offer ("Tender Offer"). Defendant received material nonpublic information about the Tender Offer from his personal friend James Shaoul – a defendant in the related case *SEC v. Cluff, et al.*, 17-cv-2460-RMB (S.D.N.Y.) – who has personal and professional ties to

Mobileye's founders.  James Shaoul also provided inside information and options trading

instructions to his brother Roger Shaoul, who in turn shared the inside information with his

friend Larry Cluff and concealed his own remarkably timed and profitable trading shortly before

the deal was announced before trading opened on March 13, 2017 ("Announcement").  Following

the Announcement, Mobileye's share price increased 28 percent to $60.62 by the close of trading

that day.  Defendant's remarkably timed purchase of equities and speculative, out-of-the-money

call options in Mobileye resulted in profits of ███████████████████.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

2.      The Commission brings this action pursuant to the authority conferred upon it by

Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

The Commission seeks permanent injunctions against the Defendant, enjoining him from

engaging in the transactions, acts, practices, and courses of business alleged in this Amended

Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set

forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to

Section 21A of the Exchange Act [15 U.S.C. § 78u-l].  The Commission seeks any other relief

the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C.

§ 78u(d)(5)].

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and

27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

4.      Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange

Act [15 U.S.C. § 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and

courses of business alleged in this Amended Complaint occurred within the Southern District of

New York and elsewhere, and were effected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails, or the

facilities of a national securities exchange. Mobileye stock is traded on the New York Stock

Exchange and the securities that Defendant purchased were traded on a number of different

exchanges, including AMEX, NASDAQOM, MIAX, PHX, BOX, CBOE, NYSE, NYSE ARCA

and GEMINI. At least four of those exchanges—AMEX, NYSE, NYSE ARCA, and ISE

Gemini—are located in Manhattan.

## DEFENDANT

5.      **Amir Waldman**: Dr. Amir Waldman is a resident of Yarqona, Israel. He is a

self-employed engineer. As described more fully below, Waldman made suspicious Mobileye

option trades with a profit of ████████████████.

## FACTS

### Intel's Announced Acquisition of Mobileye

6.      Mobileye is a Netherlands entity with its principal offices in Jerusalem, Israel.

Mobileye is a software and technology developer for Advanced Driver Assistance Systems used

for autonomous driving. Members of the Hebrew University of Jerusalem ("HUJI") science

community developed and commercialized Mobileye's technology at the time Waldman earned

his Ph.D from HUJI. Mobileye's securities are registered under Section 12(b) of the Exchange

Act and traded on the New York Stock Exchange under the ticker symbol MBLY.

7.      Mobileye directors owe fiduciary duties to Mobileye and its shareholders.

8.      Intel is a Santa Clara, California based technology company.

9.      Intel began discussions with Mobileye as early as November 2016, and continued

discussions in late January 2017. Principals of the two companies met in New York on or about

January 27, 2017, to discuss a price per share in a transaction providing for the acquisition of 100% of Mobileye's shares as well as a timeline for the transaction.  Mobileye's co-founders and directors, referred to in this Complaint as Director A and Director B, who are both citizens and residents of Israel, attended this meeting.

10.     On or about January 30, 2017, certain members of Mobileye's board discussed a potential transaction price, and by the following day, all members of Mobileye's board learned of the potential transaction.

11.     The two companies executed a non-disclosure agreement on or about February 1, 2017, which was signed by Directors A and B on behalf of Mobileye.  Among other things, the parties to this agreement acknowledged and agreed to advise their representatives who were informed of the pending transaction of the United States securities laws that restrict the purchase or sale of securities by a person who has received material nonpublic information from the issuer of such securities and that restrict the communication of material nonpublic information to any other person when it is "reasonably foreseeable" that such other person is likely to purchase or sell such securities based on the information.

12.     Directors A and B travelled to New York for several days of meetings beginning on or about February 8, 2017. A mutual friend of Director A, Director B, and James Shaoul also travelled to New York on this trip as a guest of Director A on a private chartered flight from Germany to New York. The two companies held the first meetings that included legal and financial advisers on or about February 9, 2017.

13.     From February 24-26, 2017, representatives of both companies held meetings in New York to negotiate the remaining issues between the parties and exchanged drafts of a purchase agreement.   Directors A and B attended these meetings.

14.     Intel executed a definitive agreement with Mobileye on Sunday, March 12, 2017 ("Definitive Agreement"), under which Intel would buy Mobileye for approximately $15.3 billion, or $63.54 per share, through a tender offer.  The deal was publically announced shortly before the market opened for trading on Monday, March 13, 2017.  The announced purchase price was a 34.4% premium over Mobileye's Friday, March 10, 2017, closing price of $47.27 per share.  After the Announcement, Mobileye opened on Monday, March 13, 2017, at its high for the day, $61.51, and closed at $60.62 per share, a 28 percent increase over its March 10 closing price.

### Waldman's Trading in Mobileye Securities

15.     In 2016 and 2017 Waldman traded securities in at least four separate accounts:

   a.     The ████████████████     This account is managed by Waldman's family office ("Family Office"), which manages investment portfolios for its clients, including Waldman████████████.  Although the Family Office could execute trades in the ████████████, Waldman has access to direct trades online in this account and frequently did so in the 2016-2017 time period.  The Mobileye options trading in this account was directed exclusively by Waldman in 2016-2017.  The Family Office can view Waldman's activity in the ████████████.

   b.     The ████████████ Similar to the ████████████, the Family Office manages this account, but Waldman directs some of trading in this account.  The trading in Mobileye securities in this account was directed by Waldman.  The Family Office can view Waldman's activity in the ██ ████.

    c.   The " ███████████  This account is not managed by the Family Office. Waldman directs some trading in this account and receives trading advice from ████████. The Family Office has no access to the activity in this account.

    d.   The Interactive Brokers, or "IB Account". Waldman opened an account with Interactive Brokers account on October 5, 2016 with $50,000. His statements show that this account has traded in only two securities other than Mobileye. The Family Office has no access to the activity in the IB Account.

16.     During the period beginning February 1, 2017 to the date of the Announcement, March 13, 2017 (the "Trading Period"), Waldman purchased Mobileye securities in each of these four accounts.

**A.**     **IB Account**

17.     In the IB Account, Waldman engaged in a pattern of trading Mobileye options between November 2016 and January 5, 2017. During this time, Waldman purchased Mobileye options expiring in November and December 2016 and January 2017, and generally sold them prior to expiration, usually holding the contracts for two weeks or less.

18.     For example, on November 16, 2016, Waldman purchased 1,200 Mobileye call options expiring on December 2 with strike prices between $39.00 and $42.00, representing options that were 4 to 11 percent out of the money compared to Mobileye's $37.57 November 16 closing price. Between November 18 and November 21, Waldman sold all of the call options for a cumulative profit of approximately $36,000.

19.     Waldman deposited and additional $50,000 in the IB Account in November 2016.

20.     Waldman generally took bullish Mobileye positions during the November 2016 to January 5, 2017 time period, but also invested nearly $12,000 for put contracts that targeted a decrease in the Mobileye share price. His options trading yielded realized gains of approximately $27,000 in December 2016. Waldman realized a loss of approximately $12,000 in January 2017 trading a mix of put and call options.

21.     On January 30, 2017—just days after Mobileye's January 27 meeting with Intel in New York and on the same day that Roger Shaoul (another tippee of James Shaoul) withdrew over 90% of his own liquid assets with the intent to purchase Mobileye securities—Waldman deposited an additional $70,000 in the IB Account. At the time of the deposit, the account held approximately $168,000 in cash and no equities or options. The deposit resulted in a cash balance of approximately $238,000 at the end of January 2017.

22.     Starting on February 1, 2017, the same day that Intel and Mobileye executed a non-disclosure agreement, Waldman began accumulating Mobileye call option contracts expiring between March 3, 2017, and September 15, 2017, at strike prices above Mobileye's then current price.

23.     For example, between February 1 and February 10, Mobileye's closing price ranged between a low of $42.42 and a high of $43.32. During the same period, Waldman bought 873 call option contracts expiring between March 3, 2017, and September 15, 2017, with strike prices ranging from $45.00 to $51.00, some of which were more than 20 percent out of the money at the time Waldman purchased them.

24.     By February 28, 2017, Waldman had accumulated approximately 7,000 call option contracts expiring between March 3 and September 15 with strike prices ranging from

$49.00 to $55.00.  Mobileye last closed at or above $49.00 per share on September 7, 2016, and had not closed above $50.00 in the prior 17 months.

25.     Between March 1 and March 10, 2017, Waldman accumulated an additional 1,605 call option contracts, expiring between March 17 and June 16 with strike prices ranging from $49.00 to $55.00.  As of March 10, 2017, Waldman held 5,339 Mobileye call options that he spent $237,581 to acquire.

26.     In February 2017 and early March 2017, Waldman engaged in an overall strategy that rolled over options close to expiration dates to keep the average time of expiration for his collective position close to two to three weeks.  To maintain an average time of expiration, Waldman sold options set to expire in 4-5 business days and used the proceeds to purchase options with similar strike prices but expiration dates of two to three weeks. This strategy anticipated an event occurring at some point two to three weeks out.

27.     Waldman discontinued the rollover strategy the week before the Announcement on Monday, March 13.  During the week of March 6 to March 10, Waldman made no attempt to sell the many options scheduled to expire in one week (*i.e.* options with March 17 expiration dates).  Instead, he increased his position in March 17 call options by investing over $33,000 to purchase more than 800 Mobileye options with expiration dates of March 17.

28.     After the Announcement on Monday, March 13, 2017, Waldman sold 1,697 of his options contracts for a realized gain of approximately $1,539,813.  The total profit from the Mobileye trading in this account during the Trading Period in the IB Account is approximately $4.5 million.

**B.** ▮▮▮▮▮▮▮▮▮▮

29.     The Family Office manages the ▮▮▮▮▮▮▮▮▮▮, but Waldman has the ability to direct transactions using the bank's website and without talking to the Family Office. Generally, Waldman speaks with an adviser from the Family Office each month to discuss his portfolio.

30.     While purchasing Mobileye securities in the IB Account during the Trading Period, Waldman also purchased securities in the ▮▮▮▮▮▮▮▮▮▮ that were similar to the purchases in the IB Account.

31.     During the Trading Period, Waldman never disclosed to the Family Office his activity in the IB Account or discussed the activity in his ▮▮▮▮▮▮▮▮▮▮ with his adviser.

32.     Waldman earned a profit of ▮▮▮▮▮▮▮▮▮▮ from the purchase of Mobileye securities in the ▮▮▮▮▮▮▮▮▮▮ during the Trading Period.

**C.** ▮▮▮▮▮▮▮▮▮▮

33.     Waldman used the ▮▮▮▮▮▮ to purchase over ▮▮▮▮▮▮▮ shares with an investment amount ▮▮▮▮▮▮ during the Trading Period.

34.     Waldman received a profit of ▮▮▮▮▮▮▮ on his Mobileye securities purchases in the ▮▮▮▮▮ during the Trading Period.

**D.** ▮▮▮▮▮▮▮▮▮▮

35.     Waldman consulted an adviser at ▮▮▮▮▮▮ in early February about an investment in Mobileye securities. Although Waldman sought guidance from the adviser about a potential investment in Mobileye securities, Waldman did not tell the ▮▮▮▮▮ adviser about his existing exposure to Mobileye in the IB Account. Waldman also did not provide the adviser

details of his position in the ███████████████ . Nor did Waldman discuss his plan to increase his Mobileye exposure in the IB Account and █████████████████

36.   Waldman wrote ███████████████████████████████████ during the Trading Period.

37.   Waldman received ██████████████ in profit from his trading in Mobileye Securities in the ██████████████ during the Trading Period.

E.   **Summary of Trading**

38.   In summary, the trading in Waldman's accounts includes the following indicators of unusual or suspicious trading:

**Suspicious Timing**

a.   Intel took a substantial step toward the formation of a tender offer on January 20, 2017, and met with Mobileye directors in New York on January 27, 2017 to discuss, among other things, a potential price and timeline for the deal.

b.   Waldman deposited $70,000 into the IB Account on January 30, 2017 at a time the account already held approximately $168,000 in cash and no stock or options. This is the same day that James Shaoul's other tippee, Roger Shaoul, made a substantial deposit with the intent to purchase Mobileye securities.

c.   Waldman began accumulating Mobileye call options on February 1, 2017.

d.   Waldman rolled over his options in the IB Account to maintain an average expiration date of two to three weeks while Mobileye and Intel negotiated the deal. Waldman stopped rolling over options the week before the Announcement.

**Unusual Profits**

    e.  Waldman's ▮▮▮▮▮ profits on Mobileye securities purchased during the

Trading Period were remarkable:

        i.  Approximately $4.5 million in the IB Account

        ii.  Approximately ▮▮▮▮ in the ▮▮▮▮▮▮▮

      iii.  Approximately ▮▮▮▮ in the ▮▮▮▮▮

       iv.  Approximately ▮▮▮▮ in the ▮▮▮▮

    f.  The profits in the IB Account of $4.5 million reflected a return of 1883% percent

in just five weeks.  In comparison, his trading from November 2016 through

January 2017 in the IB Account yielded profits of approximately $70,000—a

return of 45% in three months.

    g.  Waldman valued his liquid assets at the beginning of the Trading Period between

▮▮▮▮▮▮.  Waldman built this wealth over a long and successful career

as an engineer and business owner.  The total profits of ▮▮▮▮▮ just five

weeks of Mobileye trading increased the value of Waldman's liquid assets by

▮▮▮▮▮▮

**Volume and Pattern**

    h.  Prior to the Trading Period, Waldman had never purchased or held the volume of

option contracts that he purchased during the Trading Period.  He purchased at

least ▮▮▮▮ in the IB Account and the ▮▮▮▮▮▮ in

February 2017 and ▮▮▮ the first nine days of March 2017.  There are no

comparable examples in Waldman's trading history.[1] The next highest number of options contracts purchased by Waldman in one month was ███████████.

   i.  Prior to the Trading Period, Waldman had never held a high number of out-of-the-money call option contracts as long as he did during the Trading Period, and had never engaged in a rollover strategy that targeted a sharp near-term increase in share price.

   j.  The number of shares and options purchased during the Trading Period was extremely high in relation to the number of Mobileye securities held by Waldman immediately prior to the Trading Period.

**Type of Transaction**

   k.  Waldman purchased many risky out-of-the-money options during the Trading Period at strike prices at or above Mobileye's 52-week high and rolled over the options to maintain an approximate average expiration period of just 14-21 days.

**Size of Investment**

   l.  Waldman spent ███████████ to purchase Mobileye securities during the Trading Period.  There are no records showing that Waldman made a comparable sized investment in the securities of a single company in a similar time period.

**Concealment**

   m.  Waldman traded in four separate accounts during the Trading Period but largely kept the activity in the various accounts segregated from his financial advisers. Waldman sought investment advice during the Trading Period, including advice with respect to Mobileye securities, but never disclosed to his advisers the

---

[1] Trading prior to 2014 is irrelevant according to Waldman's discovery responses.

existence of his IB Account or his activity in the ███████████████████.

Waldman's Family Office could see the activity in the ████████████████,

but not the IB Account.  The only person that Waldman spoke to about the

activity in IB Account during the Trading Period was James Shaoul.

**Defendant's Possession of, and Trading on, Material Nonpublic Information**



39.   ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████.

40.   ██████████████████████████████

███████████████████.

41.     James Shaoul's brother, Roger Shaoul, has acknowledged that he made multiple purchases of out-of-the-money call options in Mobileye shares, similar to Mr. Waldman's purchases, in advance of the Announcement based solely on advice he received from his brother James.

42.     Roger Shaoul advised his friend, Larry Cluff, to invest in Mobileye.  Based on this advice, Larry Cluff facilitated Roger Shaoul's trading in Mobileye and made some limited trades on his own, as detailed below.

43.     Roger Shaoul and Cluff began trading in Mobileye securities abruptly after Intel and Mobileye began formal discussions in late January 2017.  They worked together to trade on inside information in two brokerage accounts opened in Cluff's name at optionsXpress, Inc.

("OX"), described below as the "4866 Account" and the "1784 Account." They earned a return of 488% trading Mobileye shares in the six weeks prior to the Announcement on March 13, 2017.

**A.    James Shaoul Tipped Waldman.**

44.    At the times that James Shaoul tipped Roger Shaoul and Waldman, Roger Shaoul and Waldman knew that James Shaoul had business and personal relationships with the principals of Mobileye and their families.

a. James Shaoul and his family are part of a social circle that often visits and vacations together that includes Director A, Director B, the friend that travelled to New York on the same private jet as Mobileye insiders travelling to negotiate the Tender Offer, and at least one other friend that made unusual and suspicious purchases of risky out-of-the-money Mobileye options on January 30, 2017 that targeted a sharp increase in share price before mid-March.

b. James Shaoul is one of only 35 investors in OrCam, a privately-held company also founded by Mobileye founders Directors A and B.

c. James Shaoul is a physician specializing in nonsurgical cosmetic procedures, including botox and laser hair removal. He is a principal of the MLE Medical Laser clinic in Jerusalem, Israel. Director A and his wife have received treatment at James Shaoul's clinic.

d. Director A and his wife, and Director B see James Shaoul and his family at periodic social gatherings.

e. In October 2016, James Shaoul purchased a used car from Director A.

- 14 -

Director A is not in the business of selling used cars to the public.

f.  In December 2016, Mobileye chartered a private airplane for executives to travel to Germany and Spain.  Director A offered four extra seats to his friends, and James Shaoul and his wife accepted two of the available seats.

g.  Approximately two years ago, James Shaoul's wife, a nurse, provided occasional assistance to Director B's wife when she was ill.

h.  James Shaoul has four adult children who are friends with the late-adolescent and adult children of Directors A and B.  Director B's late-adolescent child attends the same school and is in the same class as one of James Shaoul's children.  Directors A and B violated Mobileye's internal policies by informing their family members, including friends of James Shaoul's wife and children, of Intel's interest in purchasing Mobileye prior to the Announcement.

45.  James Shaoul discussed Directors A and B with Waldman from 2009 through the date of the Announcement, including when he encouraged Waldman to invest in Mobileye securities.  As an example, during or shortly before the Trading Period, James Shaoul told Waldman about trips to New York by Directors A and B, which they made in order to negotiate the Tender Offer.

46.  Directors A and/or B tipped their friend and business partner James Shaoul with material nonpublic information about the pending tender offer.  Directors A and B owed a fiduciary duty or similar obligation of trust and confidence to Mobileye and its shareholders to keep the material nonpublic information confidential.

47.  Directors A and/or B breached a fiduciary duty or similar obligation of trust and

confidence for a personal benefit by tipping the material nonpublic information to James Shaoul.

Directors A and/or B received a personal benefit by making a gift of the inside information to

James Shaoul, their friend and business partner.  Directors A and/or B expected that the

information being disclosed would be used in securities trading.

48.     James Shaoul knew or was reckless in not knowing that the information tipped by

Directors A and/or B was material and nonpublic.  Given James Shaoul's personal and business

relationships and communications with Directors A and B, James Shaoul knew, consciously

avoided knowing, or was reckless in not knowing that Directors A and/or B had breached a

fiduciary duty or similar obligation of trust and confidence for a personal benefit.  At all times

James Shaoul knew, consciously avoided knowing, or was reckless in not knowing that Directors

A and B were directors and corporate insiders at Mobileye.

49.     James Shaoul tipped his friend Waldman with material nonpublic information

about the pending Tender Offer.  Waldman knew or was reckless in not knowing that this

information was material and nonpublic.  In light of, at least, Waldman's knowledge that James

Shaoul and his family had ongoing personal and business relationships with Directors A and B

and their families, Waldman's knowledge that Directors A and B were the principals and

directors of Mobileye, Waldman's previous experience as an officer of a publicly traded

company, and the fact that Waldman did not ask James Shaoul questions about the source of

information, Waldman knew, consciously avoided knowing, or was reckless in not knowing that

information tipped by James Shaoul was material nonpublic information disclosed in violation of

a relationship of trust or in breach of fiduciary duty for a personal benefit at all times that

Waldman traded in Mobileye securities during the Trading Period.

50.     James Shaoul is a longtime friend of Directors A and B. If Directors A and/or B

provided James Shaoul with material nonpublic information about the Tender Offer with the intent that information remain confidential, James Shaoul owed Directors A and/or B a duty of trust and confidence to maintain the material nonpublic information in confidence based on James Shaoul's close relationship with Directors A and/or B.  Further, in the event that Directors A and/or B provided James Shaoul with material nonpublic information about the Tender Offer with the intent that James Shaoul maintain the information in confidence, James Shaoul breached that duty by tipping the information to Waldman, and Waldman knew, consciously avoided knowing, or was reckless in not knowing that information tipped by James Shaoul was material nonpublic information disclosed in violation of James Shaoul's duty of trust or confidence for a personal benefit at all times that Waldman traded in Mobileye securities during the Trading Period.

51.     At all times that James Shaoul provided Waldman with material nonpublic information concerning the pending tender offer, James Shaoul knew or had a reason to know that he acquired the material nonpublic information concerning the pending tender offer directly or indirectly from a Mobileye insider, namely Directors A and/or B.

52.     James Shaoul knew or had a reason to know that Waldman would trade based on the material nonpublic information that James Shaoul provided to Waldman.

53.     At all times that Waldman traded on the basis of material nonpublic information concerning the pending tender offer, Waldman knew or had a reason to know that the material nonpublic information concerning the pending tender offer had been acquired by James Shaoul directly or indirectly from a Mobileye insider, namely Directors A and/or B.

**B.    Evidence of trading by Roger Shaoul shows that James Shaoul possessed material nonpublic information at the times that he discussed Mobileye securities with Waldman.**

54.    Roger Shaoul asked Cluff to open a new trading account during a conversation that occurred on or about January 28 or 29, 2017.  During the conversation, Roger Shaoul told Cluff that Roger Shaoul could not open his own account due to his "status."  Cluff agreed to open the new account.

55.    During the same conversation on or about January 28 or 29, Roger Shaoul also suggested to Cluff that he invest in Mobileye based on inside information.  Roger Shaoul told Cluff that Roger Shaoul's family knew the principals of Mobileye and that the principals of Mobileye recommended that all their friends and family invest in Mobileye.

56.    Cluff had never heard of Mobileye until Roger Shaoul provided Cluff with the tip to purchase Mobileye securities.

57.    Roger Shaoul repeatedly encouraged Cluff to open and fund the account following the conversation in which Cluff agreed to open a separate trading account.

58.    On Sunday, January 29, 2017, Cluff submitted the application to open the new trading account, around the same time that Intel and Mobileye began formal discussions.

59.    On Monday, January 30, 2017, Roger Shaoul visited a Wells Fargo branch office and withdrew a total of $161,500 from three accounts.  On the same day, January 30, Roger Shaoul deposited the $161,500 in Cluff's personal SunTrust bank account.

60.    Waldman also made a deposit on January 30, 2017.  He deposited $70,000 in the IB Account that day.

61.    On February 1, 2017, the first day of the Trading Period defined above, Cluff funded the new 1784 Account by transferring $161,500 from his personal SunTrust bank account

into the 1784 Account.

62.     The 1784 Account has since served a single purpose – trading in Mobileye

securities. The first trade occurred on February 1. On the same date that the funds became

available in the 1784 Account, all but $80 of that money was used to purchase 3,782 Mobileye

shares at a cost of $161,421.68. Cluff made the purchase at the direction of Roger Shaoul.

63.     On February 21, 2017, Roger Shaoul deposited $30,000 into Cluff's SunTrust

bank account with the intent that Cluff would deposit the funds into the 1784 Account and that

Roger Shaoul would then use the funds to purchase Mobileye call option contracts. A $28,000

wire transfer from Cluff's SunTrust bank account posted to the 1784 Account the next day,

February 28, 2017.

64.     On March 2, 2017, Roger Shaoul impersonated Larry Cluff during calls with OX

in order to buy options in the 1784 Account. Roger Shaoul knew that he lacked authority to

trade in the 1784 Account. Roger Shaoul admits that he concealed his identity from OX when

accessing the 1784 Account because "I was not Larry." At no point did Roger Shaoul obtain

authority from OX to trade in the 1784 Account.

65.     Roger Shaoul continued to impersonate Cluff and directed the purchase of

Mobileye securities in the 1784 Account prior to the Announcement, as follows:

        a.  Between March 2 and March 10, 2017, the 1784 Account purchased 2,209

            Mobileye call options expiring March 10, March 17, and March 24 with strike

            prices ranging from $49 to $55.

        b.  On March 8, 2017, the 1784 Account sold 425 Mobileye shares for $19,920.43.

        c.  Between March 8 and March 10, the 1784 Account purchased approximately

            $20,000 in additional Mobileye call options expiring March 17 and March 24

with strike prices ranging from $50 to $55.

66.     Roger Shaoul had never traded securities before 2017. Roger Shaoul does not understand the nature of option contracts and cannot explain basic features of options contracts, including the significance of a strike price.

67.     Roger Shaoul purchased the call option contracts at the direction of his brother, James Shaoul. The direction from James Shaoul included the specific expiration dates, strike prices, and purchase prices Roger Shaoul should offer for each option contract. The strike prices and expiration dates were similar to the options purchased by Waldman on or around the same dates.

68.     Roger Shaoul developed no part of his trading strategy on his own and did not use any information other than the direction from James Shaoul as the basis for his trading.

69.     During the March 2, 2017, telephone conversations, an OX representative warned Roger Shaoul that his trading strategy was illogical and suggested that Roger Shaoul (who was impersonating Cluff) consult the source of his strategy.

70.     Roger Shaoul ended the first call, called James Shaoul to consult, and then called OX back the same day. After consulting James Shaoul, Roger Shaoul called back to OX and informed the same OX representative: "I'm going to tell you what you have to do, even if it doesn't make sense."

71.     During the time period that Roger Shaoul purchased option contracts, Mobileye's daily closing price ranged from a low of $46.19, to a high, on March 10, of $47.27.

72.     These option trades carried a significant risk: the options were approximately 4 percent to 19 percent out-of-the-money at the time they were bought, and all expired within three weeks of purchase.

73.     As of close of trading on Friday, March 10, 2017, the last trading day prior to the Announcement, the 1784 Account held 3,414 Mobileye shares and 1,209 Mobileye call options with strike prices between $50 and $55.

74.     On March 13, 2017, after the Announcement, the 1784 Account sold 862 Mobileye call options for proceeds of $617,563.85.  By the end of March 13, 2017, the 1784 Account saw realized gains of approximately $590,000 and unrealized gains of approximately $335,000, representing a total profit of approximately $925,000.

75.     In six weeks, the 1784 Account earned a return of 488% on the $189,500 deposited into the account.

76.     The trading in the two OX accounts includes the following indicators of unusual and suspicious trading:

    a.  **Timing**

         i.  Roger Shaoul and Cluff had never traded in Mobileye securities prior to 2017;

        ii.  Roger Shaoul and Cluff opened a new account specifically to trade in Mobileye securities on January 29, 2017, two days after Intel offered to purchase 100% of Mobileye;

       iii.  On the first business day after Cluff opened the 1784 Account, Roger Shaoul essentially emptied three checking accounts to which he had access for the purpose of buying Mobileye shares;

       iv.  Two days later, on February 1, 2017, the same day Intel and Mobileye executed confidentiality and exclusivity agreements regarding the proposed transaction, Cluff funded the 1784 Account with $161,500 of

Roger Shaoul's money, and Roger Shaoul directed that Cluff use all but $80 of that money to purchase Mobileye shares that day;

v.   An additional $28,000 was wired into the 1784 Account on February 28, 2017, after the final, in-person meetings of Intel and Mobileye principals and outside advisers, and two days after the Special Committee of Mobileye's board of directors received an update on the transaction;

vi.   At least as early as February 27, 2017, Roger Shaoul knew that he lacked authority from OX to trade in the 1784 Account.  Roger Shaoul began the process to obtain authority but did not wait to trade.  Instead, he impersonated Cluff in order to purchase risky out-of-the-money call options on March 2, 2017;

vii.   On March 8, 2017, as Intel and Mobileye neared the Announcement, Roger Shaoul sold some Mobileye shares and immediately reinvested the proceeds into riskier call options, some of which had strike prices 17% out of the money and expiration dates of March 17.  In other words, with just two business days until the Announcement, Roger Shaoul bet that the Mobileye share price would increase by at least 17% in nine days; and

viii.   As of March 10, 2017, the last trading day prior to the Announcement, the 1784 Account held 3,414 Mobileye shares and 1,209 Mobileye call options with strike prices between $50 and $55.

**b.  Relative Size of Investment**

    i.  As Roger Shaoul admits, Roger Shaoul is a "man of modest means" who "lives conservatively, paycheck to paycheck;"

    ii.  Despite this conservative lifestyle, Roger Shaoul withdrew 94.9% of his assets to invest in Mobileye shares on January 30, 2017; and

    iii.  On February 21, 2017, Roger Shaoul withdrew 69.2% of his liquid net worth at the time to invest in risky out-of-the-money Mobileye options.

**c.  Type of Transactions**

    i.  Roger Shaoul had never purchased, sold, or traded any securities prior to the time he purchased Mobileye securities in 2017, let alone high-risk, out-of-the-money call options;

    ii.  Roger Shaoul admits that he is an unsophisticated trader and his calls with OX demonstrate that he did not understand the call options he purchased or the questionable trading strategy he executed;

    iii.  Roger Shaoul purchased Mobileye call options that were anywhere from approximately 4 percent to 19 percent out-of-the-money at the time they were bought, and they all expired within three weeks or less of purchase; and

    iv.  The out-of-the-money call options purchased by Roger Shaoul would have expired worthless but for the Announcement and the corresponding rise of the price of Mobileye shares.

d.  <u>Amount of Profits</u>

    i.  The 1784 and 4866 OX accounts earned a six-week return of approximately 488% on the $189,500 wired into the accounts in February 2017.

e.  **<u>Roger Shaoul Lied to OX</u>**

    i.  At all times that Roger Shaoul purchased call options shortly before the Announcement, Roger Shaoul knew that he lacked authority from OX to trade in the 1784 Account;

    ii.  Roger Shaoul began to take the steps necessary to obtain authority but never completed the process;

    iii.  When Roger Shaoul purchased options on March 2, Roger Shaoul concealed his identity and caused OX to believe that he was Cluff;

    iv.  Toward the beginning of a call with OX on March 3, OX asked Roger Shaoul if he was Cluff and Roger Shaoul responded "yes." Roger Shaoul then traded options in the 1784 Account; and

    v.  Roger Shaoul could have waited to obtain authority and then purchase Mobileye options later in March or April. Roger Shaoul's deceit betrays his urgency to trade before the Announcement and illustrates the risks Roger Shaoul was willing to take to trade before the Announcement. Indeed, he did not purchase securities of any company after the Announcement and abandoned his efforts to obtain authority from OX to do so.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

77.     The Commission realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

78.     By virtue of the foregoing, Defendant, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

79.     By virtue of the foregoing, Defendant, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder**

80.     The Commission realleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

81.     By virtue of the foregoing, Defendant, singly or in concert with others, in connection with a tender offer, directly or indirectly: (a) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) purchased or caused to be purchased securities or options to obtain securities while in possession of material information related to a tender offer which information Defendant knew or had reason to know was

nonpublic and which Defendant knew or had reason to know had been acquired directly or indirectly from Intel or Mobileye or any officer director, partner, employee or any other person acting on behalf of Intel or Mobileye before such information and its source were publicly disclosed.

82.     By virtue of the foregoing, Defendant, directly or indirectly, violated, and unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3(a) thereunder [17 CFR § 240.14e–3(a)].

## **RELIEF SOUGHT**

**WHEREFORE**, the Commission respectfully requests that this Court enter an order preliminary freezing Defendant's assets in the IB account in which the trading described in this Complaint occurred, and enter a Final Judgment:

### **I.**

Permanently restraining and enjoining the Defendant, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### **II.**

Ordering Defendant to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint;

### **III.**

Ordering Defendant to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1];

**IV.**

Granting such other and further relief as this Court may deem just and proper.

**<u>JURY DEMAND</u>**

The Commission demands a trial by jury on all claims so triable.

Dated: November 14, 2017

Gregory A. Kasper
James A. Scoggins, II (*pro hac*)
Terry R. Miller (*pro hac*)
Stephen C. McKenna (*pro hac*)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
kasperg@sec.gov
scogginsj@sec.gov
millerte@sec.gov
mckennas@sec.gov

## CERTIFICATE OF SERVICE

I certify that on November 14, 2017, a copy of the foregoing document was served via e-mail upon the following:

Gregory S. Bruch
Rory Flynn
Khiran Sidhu
Bruch Hanna LLP
1099 New York Avenue, NW
Suite 500
Washington, DC 20001
Telephone: (202) 969-1631

*Counsel for Amir Waldman*

<u>/s/ Stephen C. McKenna</u>